## ESTEP ·v. UNITED STATES.

NO. 292.

Argued November 7, 1945.—Decided February 4, 1946.

*Hayden C. Covington* argued the cause for petitioners. With him on the brief were *Grover C. Powell* and *Curran E. Cooley.*

*Irving S. Shapiro* argued the cause for the United States. With him on the briefs were *Solicitor General McGrath* and *Robert S. Erdahl.* *Walter J. Cummings, Jr.,* also was on the brief in No. 292.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

In *Falbo* v. *United States,* 320 U. S. 549, we held that in a criminal prosecution under § 11 of the Selective Training and Service Act of 1940 (54 Stat. 894, 50 U. S. C. App. § 311) a registrant could not defend on the ground that he was wrongfully classified and was entitled to a statutory exemption, where the offense was a failure to report for induction into the armed forces or for work of national importance.[1]   We found no provision for judicial

---

[1] Sec. 5 (g) of the Act provides that a registrant shall "be assigned to work of national importance under civilian direction" if he is conscientiously opposed to induction into the armed services even for noncombatant service.  See Selective Service Regulations, 652.1–652.14, 653.1–653.16.

review of a registrant's classification prior to the time when he had taken all the steps in the selective process and had been finally accepted by the armed services. The question in these cases is whether there may be judicial review of his classification in a prosecution under § 11 where he reported for induction, was finally accepted, but refused to submit to induction.

Estep's local board classified him as I–A, i. e., as available for military service.[2] Sec. 5 (d) of the Act exempts from training and service (but not from registration) "Regular or duly ordained ministers of religion . . ." Under the regulations those in that category are classified as IV–D.[3] Estep, a member of Jehovah's Witnesses, claimed that he was entitled to that classification. The local board ruled against him. He took his case to the appeal board which classified him as I–A.[4] He then asked the State and National Directors of Selective Service to appeal to the President for him.[5] His request was refused. The local board thereupon ordered him to report for induction. He reported at the time and place indicated. He was accepted by the Navy. But he refused to be inducted, claiming that he was exempt from service because he was an ordained minister of the gospel.

---

[2] Selective Service Regulations, 622.11.

[3] *Id.*, 622.44.

[4] By § 10 (a) (2) of the Act the President was authorized to establish "civilian local boards and such other civilian agencies, including appeal boards and agencies of appeal, as may be necessary to carry out the provisions of this Act." The provisions governing appeals to the boards of appeal are contained in 627.1–627.61 of the regulations. The Act provides a special appeal procedure for conscientious objectors. See § 5 (g).

[5] Either of them may take such an appeal at any time when he "deems it to be in the national interest or necessary to avoid an injustice . . ." Selective Service Regulations, 628.1. A registrant may appeal to the President when he is classified as I–A provided one or more of the board of appeal dissented from such classification. *Id.*, 628.2. In Estep's case the board of appeal was unanimous in classifying him in I–A.

He was indicted under § 11 of the Act for wilfully failing and refusing to submit to induction.[6] He sought to defend on the ground that as a Jehovah's Witness he was a minister of religion and that he had been improperly denied exemption from service, because the classifying agencies acted arbitrarily and capriciously in refusing to classify him as IV–D. He also claimed that his right to an effective appeal had been denied because the local board unlawfully withheld certain relevant documents from the appeal board and included improper material in the record on appeal. The district court rejected these defenses and did not permit the introduction of evidence to sustain Estep's contention. The jury found him guilty and he was sentenced to imprisonment for a term of five years. On appeal the circuit court of appeals affirmed, on a divided vote. 150 F. 2d 768.

Smith, like Estep, is a member of Jehovah's Witnesses. He claimed exemption from all service on the ground that he was a minister of religion. His local board placed him in Class I–A, as available for military service. His classification was affirmed by the appeal board. On appeal to the President his classification was again affirmed. The local board then ordered him to report for induction. He reported to the induction station, was accepted by the military, but refused to be inducted, claiming he was exempt from service because he was a minister. He was inducted against his will and later was held for trial by a general court-martial for disobedience of military orders. He filed a petition for a writ of *habeas corpus* which was denied. *Smith* v. *Richart*, 53 F. Supp. 582. While his

---

[6] Sec. 11 so far as material here provides: "any person who . . . shall knowingly fail or neglect to perform any duty required of him under or in the execution of this Act, or rules or regulations made pursuant to this Act, . . . shall, upon conviction in the district court of the United States having jurisdiction thereof, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment . . ."

appeal was pending, we decided *Billings* v. *Truesdell*, 321 U. S. 542. He was thereupon released from military custody and indicted for violation of § 11 of the Act. At the trial he sought to attack the classification given him by his local board, claiming, among other things, that it acted without any foundation of fact, discriminated against him because he was a Jehovah's Witness, and denied him the right to make full proof of his claim that he was a minister of religion. The court ruled that no such defense could be tendered. Smith was found guilty by the jury and a sentence of three and one-half years was imposed. The judgment of conviction was affirmed on appeal. 148 F. 2d 288.

The cases are here on petitions for writs of certiorari which we granted because of the importance of the question presented.

Congress entrusted the administration of the Selective Service System to civilian agencies, not to the military. It authorized the President to create and establish a Selective Service System and to establish civilian local boards and appeal boards to administer it. § 10 (a) (2). The Selective Service System was designed to "provide for the classification of registrants and of persons who volunteer for induction under this Act on the basis of availability for training and service . . ." *Id.* Congress specified certain restricted classes for deferment[7] or exemption from service, including in the latter, as we have said, "Regular or duly ordained ministers of religion . . ." § 5. The President was authorized to provide for the deferment of other classes by rules and regulations.[8] § 5

[7] Thus by § 5 (c) (1) specified classes of public officials were deferred from training and service while holding their offices.

[8] The regulations placed in deferred classifications those whose employment in industry, agriculture, or other occupations or whose activity was found to be necessary to the maintenance of the national health, safety, or interest; those who had persons dependent on them for support; those found to be physically, mentally, or morally deficient or defective. See Selective Service Regulations 622.21, 622.25–1, 622.32, 622.61, 622.62.

(e). And the local boards "under rules and regulations prescribed by the President" were granted the "power within their respective jurisdictions to hear and determine, subject to the right of appeal to the appeal boards herein authorized, all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this Act of all individuals within the jurisdiction of such local boards." § 10 (a) (2). The Act makes no provision in terms for judicial review of the actions of the local boards or the appeal boards. For § 10 (a) (2) states that the "decisions of such local boards shall be final except where an appeal is authorized in accordance with such rules and regulations as the President may prescribe." [9]

By the terms of the Act Congress enlisted the aid of the federal courts only for enforcement purposes. Sec. 11 makes criminal a wilful failure to perform any duty required of a registrant by the Act or the rules or regulations made under it. An order to report for induction is such a duty; and it includes the duty to submit to induction. *Billings* v. *Truesdell, supra,* p. 557. Sec. 11 confers jurisdiction on the district courts to try one charged with such offense. But § 11 is silent when it comes to the defenses, if any, which may be interposed.

Thus we start with a statute which makes no provision for judicial review of the actions of the local boards or the appeal agencies. That alone, of course, is not decisive.

---

[9] The part of § 10 (a) (2) relevant here provides: "Such local boards, under rules and regulations prescribed by the President, shall have power within their respective jurisdictions to hear and determine, subject to the right of appeal to the appeal boards herein authorized, all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this Act of all individuals within the jurisdiction of such local boards. The decisions of such local boards shall be final except where an appeal is authorized in accordance with such rules and regulations as the President may prescribe."

For the silence of Congress as to judicial review is not necessarily to be construed as a denial of the power of the federal courts to grant relief in the exercise of the general jurisdiction which Congress has conferred upon them. *American School of Healing* v. *McAnnulty,* 187 U. S. 94; *Gegiow* v. *Uhl,* 239 U. S. 3; *Stark* v. *Wickard,* 321 U. S. 288. Judicial review may indeed be required by the Constitution. *Ng Fung Ho* v. *White,* 259 U. S. 276. Apart from constitutional requirements, the question whether judicial review will be provided where Congress is silent depends on the whole setting of the particular statute and the scheme of regulation which is adopted. *Switchmen's Union* v. *Mediation Board,* 320 U. S. 297, 301. And except when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses.

The authority of the local boards whose orders are the basis of these criminal prosecutions is circumscribed both by the Act and by the regulations. Their authority to hear and determine all questions of deferment or exemption is, as stated in § 10 (a) (2), limited to action "within their respective jurisdictions." It is only orders "within their respective jurisdictions" that are made final. It would seem, therefore, that if a Pennsylvania board ordered a citizen and resident of Oregon to report for induction, the defense that it acted beyond its jurisdiction could be interposed in a prosecution under § 11. That case would be comparable to *Tung* v. *United States,* 142 F. 2d 919, where the local board ordered a registrant to report for induction without allowing him the appeal to which he was entitled under the regulations. Since § 10 (a) (2) makes the decisions of the local boards final "except where an appeal is authorized" under the regulations, the defer.se was allowed in the criminal trial.

Any other case where a local board acts so contrary to its granted authority as to exceed its jurisdiction [10] does

[10] See cases cited in note 14, *infra.*

not stand on a different footing. By § 10 (a) (2) the local boards, in hearing and determining claims for deferment or exemption, must act "under rules and regulations prescribed by the President . . ." Those rules limit, as well as define, their jurisdiction. One of those regulations forbids the local boards from basing their classification of a registrant on a discrimination "for or against him because of his race, creed, or color, or because of his membership or activity in any labor, political, religious, or other organization." 623.1. Another provides, in accordance with the mandate contained in § 5 (c) (1) of the Act, for the deferment of governors of States and members of Congress while they hold their offices.[11] 622.42. Another provides that the local board "shall reopen and consider anew the classification of a registrant" on the written request of the State Director or the Director and upon receipt of the request "shall immediately cancel" any order to report for induction or for work of national importance. 626.2–1. If a local board ordered a member of Congress to report for induction, or if it classified a registrant as available for military service because he was a Jew, or a German, or a Negro, it would act in defiance of the law. If a local board refused to reopen on the written request of the State Director a registrant's classification and refused to cancel its order to report for induction, it would be acting in the teeth of the regulations. In all such cases its action would be lawless and beyond its jurisdiction.

We cannot read § 11 as requiring the courts to inflict punishment on registrants for violating whatever orders the local boards might issue. We cannot believe that Congress intended that criminal sanctions were to be applied to orders issued by local boards no matter how flagrantly they violated the rules and regulations which define their jurisdiction. We are dealing here with a

---

[11] 622.42 provides, "In Class IV–B *shall be placed* any registrant" who holds specified offices. (Italics added.)

question of personal liberty. A registrant who violates the Act commits a felony.[12] A felon customarily suffers the loss of substantial rights.[13] Sec. 11, being silent on the matter, leaves the question of available defenses in doubt. But we are loath to resolve those doubts against the accused. We cannot readily infer that Congress departed so far from the traditional concepts of a fair trial when it made the actions of the local boards "final" as to provide that a citizen of this country should go to jail for not obeying an unlawful order of an administrative agency. We are loath to believe that Congress reduced criminal trials under the Act to proceedings so barren of the customary safeguards which the law has designed for the protection of the accused. The provision making the decisions of the local boards "final" means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave

---

[12] "All offenses which may be punished by death or imprisonment for a term exceeding one year shall be deemed felonies." Criminal Code § 335, 18 U. S. C. § 541.

[13] *California:* § 2600 of the Penal Code provides that a sentence of imprisonment for less than life suspends all civil rights and forfeits all public offices and private trusts, authority, or power during the imprisonment.

*New York:* For a similar provision see § 510 of the Penal Law.

*Missouri:* § 4561 Rev. Stat. Ann. renders any person sentenced to a penitentiary or convicted of a felony for any crime incompetent to serve as a juror, and forever disqualifies him from voting or holding office, unless pardoned.

the registrant.[14]  See *Goff* v. *United States,* 135 F. 2d 610, 612.

*Falbo* v. *United States, supra,* does not preclude such a defense in the present cases.  In the *Falbo* case the defendant challenged the order of his local board before he had exhausted his administrative remedies.  Here these registrants had pursued their administrative remedies to the end.  All had been done which could be done.  Submission to induction would be satisfaction of the orders of the local boards, not a further step to obtain relief from them.[15]

If § 11 were not construed to permit the accused to defend on the ground that his local board acted beyond its jurisdiction, a curious result would follow.  The remedy of *habeas corpus* extends to a case where a person "is in custody in violation of the Constitution or of a law . . . of the United States . . ."  R. S. § 753, 28 U. S. C. § 453. It has been assumed that *habeas corpus* is available only

[14] That is the scope of judicial inquiry in deportation cases where Congress has made the orders of deportation "final." *Chin Yow* v. *United States,* 208 U. S. 8; *Ng Fung Ho* v. *White, supra; Mahler* v. *Eby,* 264 U. S. 32; *U. S. ex rel. Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103; *Bridges* v. *Wixon,* 326 U. S. 135.  That is also the scope of judicial inquiry when a registrant after induction seeks release from the military by *habeas corpus.*  See *United States* v. *Cain,* 144 F. 2d 944.

[15] It is said that our conclusion runs counter to an unbroken line of cases holding that a registrant may not challenge his classification in a prosecution under § 11.  But most of those cases on their facts involved only the issue presented by the *Falbo* case.  In only a few of them was the issue presented here necessary for decision.  The question was reserved in *United States* v. *Pitt,* 144 F. 2d 169, 173 (C. C. A. 3d, 1944).  In the following cases, the question was necessary for decision, and it was held that the defense was not available: *Fletcher* v. *United States,* 129 F. 2d 262 (C. C. A. 5th, 1942) ; *United States* v. *Rinko,* 147 F. 2d 1 (C. C. A. 7th, 1945) ; *Gibson* v. *United States,* 149 F. 2d 751 (C. C. A. 8th, 1945) ; *Koch* v. *United States,* 150 F. 2d 762 (C. C. A. 4th, 1945).

after a registrant has been inducted into the armed services.[16] But if we now hold that a registrant could not defend at his trial on the ground that the local board had no jurisdiction in the premises, it would seem that the way would then be open to him to challenge the jurisdiction of the local board after conviction by *habeas corpus*.[17] The

[16] See *United States* v. *Grieme,* 128 F. 2d 811; *United States* v. *Kauten,* 133 F. 2d 703; *United States* v. *Mroz,* 136 F. 2d 221; *Biron* v. *Collins,* 145 F. 2d 758; *Fujii* v. *United States,* 148 F. 2d 298; *Gibson* v. *United States,* 149 F. 2d 751. See Connor and Clarke, Judicial Investigation of Selective Service Action, 19 Tulane L. Rev. 344; Elliff, Jehovah's Witnesses and the Selective Service Act, 31 Va. L. Rev. 811.

[17] The courts which have said that *habeas corpus* was available only after induction (see note 16, *supra*) appear to have been influenced by the decisions arising under the 1917 Act, 40 Stat. 76, 50 U. S. C. App. § 201. Thus in *United States* v. *Grieme, supra,* note 16, p. 814, the court in ruling that the findings of the local boards were not reviewable by the courts said, "Here again the rule is similar to the construction placed upon the Selective Draft Act of 1917. See *Ex parte Hutflis,* 245 F. 798, 799." The latter case involved a petition for a writ of *habeas corpus* after induction, which was the accepted way of challenging the jurisdiction of the draft boards under the 1917 Act. But as we pointed out in *Billings* v. *Truesdell, supra,* p. 546, a registrant under the 1917 Act was subject to military law from the time he was ordered to present himself for induction. Defiance of the order was held to constitute desertion even though the draftee had not been afforded a fair hearing by the board. *Ex parte Romano,* 251 F. 762; *Ex parte Tinkoff,* 254 F. 912. It was said in *Ex parte Romano, supra,* p. 764: "Although based on irregular proceedings, it was not void. Until vacated, it was binding on the petitioner."

But as *Billings* v. *Truesdell, supra,* makes plain, the present Act and the regulations promulgated under it are different. A registrant is not subject to military law from the time he is ordered to report for induction, but only after he has submitted to induction. Thus the decisions under the 1917 Act, holding that his remedy against unlawful action of the local board is by way of *habeas corpus* after induction, are no guide to decision under the present Act.

It is true that after the conviction of the defendant in the *Falbo* case, his petition for a writ of *habeas corpus* was denied. 141 F. 2d 689. And in a like situation *habeas corpus* was denied in advance of the trial. *Albert* v. *Goguen,* 141 F. 2d 302. But in those cases addi-

court would then be sending men to jail today when it was apparent that they would have to be released tomorrow.

We do not suggest that because Congress has provided one judicial remedy another should be implied. We may assume that where only one judicial remedy is provided, it normally would be deemed exclusive. But the fact that *habeas corpus* after conviction is available in these cases gives added support to our reading of § 11. It supports a rejection of a construction of the Act that requires the courts to march up the hill when it is apparent from the beginning that they will have to march down again.

We express no opinion on the merits of the defenses which were tendered. Since the petitioners were denied the opportunity to show that their local boards exceeded their jurisdiction, a new trial must be had in each case.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

MR. JUSTICE MURPHY, concurring.

To sustain the convictions of the two petitioners in these cases would require adherence to the proposition that a person may be criminally punished without ever being accorded the opportunity to prove that the prosecution is based upon an invalid administrative order. That is a proposition to which I cannot subscribe. It violates the most elementary and fundamental concepts of due process of law. It condemns a man without a full hearing and a consideration of all of his alleged defenses. To sanc-

---

tional steps in the selective service procedure remained to be taken. Denial of *habeas corpus* followed by analogy to the familiar situations where other corrective procedures had been available which might have afforded relief from the orders complained of. See *Bowen* v. *Johnston*, 306 U. S. 19; *Ex parte Williams*, 317 U. S. 604; *Ex parte Hawk*, 321 U. S. 114. But in the present cases the registrants, as we have said, had pursued their administrative remedies to the end.

tion such a proposition is to place an indelible "blot upon our jurisprudence and civilization," *McVeigh* v. *United States,* 11 Wall. 259, 267, which cannot be justified by any appeal to patriotism or wartime exigencies.

The two courts below condemned the petitioners to prison for failing to obey orders to report for induction into the armed services, which had previously found them physically fit. Petitioners do not deny that they disobeyed these orders. They do claim, however, that there was a singular lack of procedural due process in the issuance of the induction orders and that the orders were therefore invalid—claims that must be assumed to be true for purposes of the cases before us. But the courts below, relying upon *Falbo* v. *United States,* 320 U. S. 549, forbade them from raising such claims. Under that view, it is irrelevant that the petitioners had never had a prior opportunity and will never have a future chance to test these claims; it is likewise immaterial that the claims, if proved, might completely absolve them from liability. Thus the stigma and penalties of criminality attach to one who wilfully disobeys an induction order which may be constitutionally invalid, or unauthorized by statute or regulation, or issued by mistake, or issued solely as the result of bias and prejudice. The mere statement of such a result is enough to condemn it.

The reasons advanced for thus depriving the petitioners of their liberty without due process of law are unmeritorious.

*First.* It is said that Congress so designed the Selective Training and Service Act of 1940 as to preclude courts from inquiring into the validity of an induction order during the course of a prosecution under § 11 for a wilful failure to obey such an order. But if that is true, the Act is unconstitutional in this respect. Before a person may be punished for violating an administrative order due process of law requires that the order be within the authority of

the administrative agency and that it not be issued in such a way as to deprive the person of his constitutional rights. A court having jurisdiction to try such a case has a clear, inherent duty to inquire into these matters so that constitutional rights are not impaired or destroyed. Congress lacks any authority to negative this duty or to command a court to exercise criminal jurisdiction without regard to due process of law or other individual rights. To hold otherwise is to substitute illegal, administrative discretion for constitutional safeguards. As this Court has previously said, "Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority." *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 52. This principle has been applied many times in the past for the benefit of corporations. *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, 289; *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456, 486; *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 432; *Prentis* v. *Atlantic Coast Line Co.,* 211 U. S. 210. I assume that an individual is entitled to no less respect.

But the Act need not be construed so as to reach this unconstitutional result. Nothing in the statute commands courts to shut their eyes to the Constitution or to deny a full and fair hearing when performing their functions under § 11, and we should be unwilling to imply such a prohibition. Once the judicial power is properly invoked under § 11, a court has unquestioned authority under the Constitution and the Judicial Code to accord a defendant due process of law and to inquire into alleged deprivations of constitutional rights despite the absence of any specific authority under the Act to that effect. A contrary result certainly is not dictated by the fact that the Act makes local board decisions "final," subject to the

administrative appeal provisions. This merely determines the point of administrative finality, leaving to the courts the ultimate and historical duty of judging the validity of the "final" administrative orders which they are called upon to enforce with criminal sanctions, at least where no other method of judicial review is previously available.

A construction of the Act so as to insure due process of law and the protection of constitutional liberties is not an amendment to the Act. It is simply a recognized use of the interpretative process to achieve a just and constitutional result, coupled with a refusal to ascribe to Congress an unstated intention to cause deprivations of due process.

*Second.* It is urged that the purpose and scheme of the legislative program necessitate the foreclosure of a full hearing in a criminal proceeding under § 11. The urgent need of mobilizing the manpower of the nation for emergency purposes and the dire consequences of delay in that process are emphasized. From this premise it is argued that no "litigious interruption" in the selective process can be tolerated and that judicial inquiry into the validity of an induction order during the course of a criminal proceeding is a prime example of a "litigious interruption."

This argument, which was pressed so urgently and successfully in the *Falbo* case, conveniently ignores the realities of the situation. The selective process, in relation to the petitioners, was finally and completely interrupted at the time when they disobeyed the induction orders and subjected themselves to possible criminal liability. Any subsequent judicial review of the induction orders could have no possible effect upon the continuance of the selective process and could bear no earmarks of a "litigious interruption." Thus at the time of petitioners' trials the courts were confronted with accomplished interruptions rather than with a theory. A decision at that point to

grant petitioners full hearings and to protect their constitutional rights would simply be a recognition of the fact that the Constitution protects the petitioners whenever their liberty is at stake, whatever may have been their motives in disobeying the orders.

It is alleged, of course, that to allow a full hearing in a criminal proceeding under this Act would be to extend an open invitation to all inductees to disobey their induction orders and litigate the validity of the orders in the subsequent trials. This is at best a poor excuse for stripping petitioners of their rights to due process of law. Moreover, the degree to which judicial review at this stage would encourage disobedience of induction orders lies in the realm of conjecture and cannot be demonstrated one way or the other by proof. But common sense would indicate that the number of those willing to undergo the risk of criminal punishment in order to test the validity of their induction orders, with the attendant difficulties of proof, would be extremely small. Adherence to due process of law in criminal trials is unlikely to impede the war effort unduly. And should perchance the opposite be true there are undoubtedly legislative means of combating the problem.

*Third.* The further suggestion is made that the only judicial review of induction orders available is by means of habeas corpus proceedings brought subsequent to induction and that this remedy satisfies whatever judicial review may be required by the Constitution. I fully concur in the desirability and necessity of such a proceeding for those who have been inducted and who wish to test the validity of their induction orders.

It should be noted in passing, however, that this remedy may be quite illusory in many instances. It requires one first to enter the armed forces and drop every vestige of civil rights. Military orders become the law of life and violations are met with summary court-martial procedure.

No more drastic condition precedent to judicial review has ever been framed. Many persons with religious or conscientious scruples are unable to meet such a condition. But even if a person is inducted and a quest is made for a writ of habeas corpus, the outlook is often bleak. The proceeding must be brought in the jurisdiction in which the person is then detained by the military, which may be thousands of miles removed from his home, his friends, his counsel, his local board and the witnesses who can testify in his behalf. Should he overcome all these obstacles and possess enough money to proceed further, he still faces the possibility of being shifted by the military at a moment's notice into another jurisdiction, thus making the proceeding moot. There is little assurance, moreover, that the military will treat his efforts to obtain the writ with sympathetic understanding. These practical difficulties may thus destroy whatever efficacy the remedy might otherwise have and cast considerable doubt on the assumption that habeas corpus proceedings necessarily guarantee due process of law to inductees.

But the availability of judicial review through habeas corpus proceedings misses the issue in this case. Such a proceeding may or may not provide an adequate remedy for the person who has been inducted. We are dealing here, however, with two persons who have not been inducted and who never will be inducted by force of the orders under attack. The writ of habeas corpus following induction is thus a completely non-existent remedy so far as these petitioners are concerned. It neither adds to nor detracts from the reasons for granting judicial review in these criminal proceedings.

If, as I believe, judicial review of some sort and at some time is required by the Constitution, then when and where can these petitioners secure that review? They have not had a prior chance to obtain review of the induction orders; nor will they subsequently be accorded the oppor-

tunity to test their contentions in court. It is no answer that they should have pursued different courses of action and secured writs of habeas corpus after induction. Due process of law is not dispensed on the basis of what people might have or should have done. The sole issue here is whether due process of law is to be granted now or never. The choice seems obvious.

By denying judicial review in this criminal proceeding, the courts below in effect said to each petitioner: You have disobeyed an allegedly illegal order for which you must be punished without the benefit of the judicial review required by the Constitution, although if you had obeyed the order you would have had all the judicial review necessary. I am at a loss to appreciate the logic or justice of that position. It denies due process of law to one who is charged with a crime and grants it to one who is obedient. It closes the door of the Constitution to a person whose liberty is at stake and whose need for due process of law is most acute. In short, it condemns a man without a fair hearing.

There is something basically wrong and unjust about a juridical system that sanctions the imprisonment of a man without ever according him the opportunity to claim that the charge made against him is illegal. I am not yet willing to conclude that we have such a system in this nation. Every fiber of the Constitution and every legal principle of justice and fairness indicate otherwise. The reports are filled with decisions affirming the right to a fair and full hearing, the opportunity to present every possible defense to a criminal charge and the chance at some point to challenge an administrative order before punishment. Those rudimentary concepts are ingrained in our legal framework and stand ready for use whenever life or liberty is in peril. The need for their application in this instance seems beyond dispute.

We must be cognizant of the fact that we are dealing here with a legislative measure born of the cataclysm of war, which necessitates many temporary restrictions on personal liberty and freedom. But the war power is not a blank check to be used in blind disregard of all the individual rights which we have struggled so long to recognize and preserve. It must be used with discretion and with a sense of proportionate values. In this instance it seems highly improbable that the war effort necessitates the destruction of the right of a person charged with a crime to obtain a complete review and consideration of his defense. As long as courts are open and functioning, judicial review is not expendable.

All of the mobilization and all of the war effort will have been in vain if, when all is finished, we discover that in the process we have destroyed the very freedoms for which we fought. These cases represent a small but significant reflection of that fact. The reversal of the judgments below is therefore in line with the highest traditions of the Court.

MR. JUSTICE RUTLEDGE, concurring.

I join in the result in each case and in the Court's opinion for the reasons it sets forth. A further reason would force me to this result. In my judgment a contrary construction would invalidate the statute. I have no doubt that Congress could make administrative or executive action final in such matters as these in the sense of excluding all judicial review, excepting only what may be required by the Constitution in the absence of suspension of the writ of habeas corpus.[1]  Cf. *Ex parte McCardle,* 6

---

[1] Under the Selective Draft Act of 1917, the civil courts were not called upon to enforce induction orders by criminal proceedings; for the receipt of such an order automatically subjected a draftee to military law and for disobedience thereof he was triable by a court-martial for desertion. See *United States* v. *McIntyre,* 4 F. 2d 823; *Billings* v. *Truesdell,* 321 U. S. 542, 545–546; cf. the *Selective Draft Law Cases,* 245 U. S. 366.

Wall. 318; *Lockerty* v. *Phillips,* 319 U. S. 182; *Ng Fung Ho* v. *White,* 259 U. S. 276.

But as I do not think Congress can make it a crime punishable by the federal judicial power to violate an administrative order without affording an adequate opportunity to show its constitutional invalidity, cf. *Yakus* v. *United States,* 321 U. S. 414, 460, dissenting opinion,[2] so even more do I not think Congress can make criminal the disobedience to such an order allowing no opportunity whatever for showing its unconstitutionality. It is one thing to deny jurisdiction of the courts altogether, save in so far as the Constitution of its own force may preserve the jurisdiction. It is altogether different to confer jurisdiction for enforcement purposes, but in doing so to cut off all right of defense on constitutional grounds.

To sustain such a view not only would have the courts marching up the hill in the criminal case and down again in habeas corpus.[3] It would make the judicial function a rubber stamp in criminal cases for administrative or ex-

---

[2] And see the authorities cited in the Court's opinion, 321 U. S. at 433, 435. Apart from the question of the validity of splitting a criminal trial into civil and highly attenuated criminal parts, the issue in the *Yakus* case related to the adequacy of the opportunity allowed for challenging the order's validity in the Emergency Court of Appeals. The ruling did not comprehend a situation where no opportunity is afforded prior to or during the trial.

[3] It is not necessary in these cases to determine whether Congress could confine the scope of review in the criminal cause, on constitutional grounds, to those which might be asserted in habeas corpus after conviction. The very fact that ordinarily the permissible scope of such objections in the latter type of proceeding is considerably more restricted than in the former is additional reason for not accepting the Government's view that Congress intended to allow review by habeas corpus but not by defense in the criminal trial.

That view, of course, rejects the idea that "final" in the statute "means final," that is, beyond judicial reach in any manner, as it likewise implicitly but necessarily denies that "within the jurisdiction"—of the local boards—is wholly geographical.

ecutive action. And it would close the trap which, in *Billings* v. *Truesdell,* 321 U. S. 542, 558, we said would be set if *Falbo* v. *United States,* 320 U. S. 549, were construed to permit what it is now sought to have done to the petitioners.

Mr. Justice Frankfurter, concurring in result.

Although Congress, in 1940, and by reenactment since, provided that when a draft board determines whether a registrant is entitled to exemption or deferment the board's decision is "final," the Court now concludes that such a decision is not final but may be reviewed when the registrant is tried before a jury for wilful disobedience of a board's order. Not only is such a result opposed to the expressed will of Congress. It runs counter to the achievement of the great object avowed by Congress in enacting this legislation; it contradicts the settled practice under the Selective Service Act throughout the war years, recognized as such by authoritative Congressional opinion; it reverses all the circuit courts of appeals before whom the matter has come, constituting an impressive body of decisions and expressing the views of more than forty judges.

The case is this. Estep was a Jehovah's Witness. By virtue of that fact he claimed the protection of § 5 (d) of the Selective Training and Service Act of 1940 (54 Stat. 885, 888; 50 U. S. C. App. § 305 (d)), which exempts from service "Regular or duly ordained ministers of religion . . ." His local board ruled against this claim and classified Estep as I–A, that is, available for military service, and ordered him to report for induction. He reported and was accepted by the Navy but refused to submit to induction. See *Billings* v. *Truesdell,* 321 U. S. 542. This prosecution was then commenced under § 11 of the Act (54 Stat. 885, 894; 50 U. S. C. App. § 311). That section makes it an offense for any person wilfully to disobey

"any of the provisions of this Act, or the rules or regulations made or directions given thereunder . . ." Concededly Estep failed to carry out the order of the board to submit to induction. Estep sought to defend disobedience on the ground that the local board had improperly denied his claim of exemption from service in that they refused to classify him as a "regular or duly ordained minister of religion . . ." He also offered in defense proof of alleged misconduct by the board bearing on his right of appeal from the board's decision. Disallowance of these defenses by the district court, which after conviction were sustained by the Circuit Court of Appeals, presents two issues for our consideration: I. Is the decision of a local board denying a claim of exemption subject to reconsideration in a criminal prosecution for knowingly failing to discharge the duties required by the Act as a result of such classification? II. Is action by the local board whereby a registrant is cut off from the opportunities of a review within the Selective Service process as authorized by the Act available as a defense in such prosecution for disobedience of the local board's order? These are questions of such moment in the enforcement of the Selective Service Act as to call for an adequate statement of the reasons that impel disagreement with the major conclusion of the Court.

## I.

Did Congress place within the Selective Service System the authority for determining who shall and who shall not serve in the armed services, who shall and who shall not enjoy the exemptions and deferments by which Congress has qualified the duty of all to serve? Or, did it leave such determination for reconsideration in trials before juries of persons charged with wilful disobedience of duties defined by the Act? This is the crucial issue in the case and touches the very nerve-center of the Selective Service Act.

One would suppose that Congress expressed its will with the utmost clarity, precluding the need of labored argumentation as to its purpose. Section 10 (a) (2) gives the answer.

> "Such local boards, under rules and regulations prescribed by the President, shall have power within their respective jurisdictions to hear and determine, subject to the right of appeal to the appeal boards herein authorized, all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this Act of all individuals within the jurisdiction of such local boards. The decisions of such local boards shall be final except where an appeal is authorized in accordance with such rules and regulations as the President may prescribe." 54 Stat. 885, 893; 50 U. S. C. App. § 310 (a) (2).

These words can only mean what they appear to mean if they are read as ordinary words should be read. Ordinary words should be read with their common, everyday meaning when they serve as directions for ordinary people. If legislation was ever designed to define the rights and duties of the vast body of ordinary people, it is the Selective Service Act. One need not italicize "final" to make final mean final, when nowhere in the Act is there any derogation of this Congressional command of finality to "the decisions of such local boards," subject only to reviewability within the Selective Service System.

But if one goes beyond the meaning that the text spontaneously yields, all other relevant considerations only confirm what the text expresses. To allow judicial review of a board's decision on classification is not to respect the context of purpose into which a specific provision of a law is properly placed. To do so disregards that purpose. And Congress did not rely on the public understanding of the purpose that moved it in passing the Selective Service Act, as well it might have, considering that the Act was passed in September, 1940. It was explicit: "the Con-

gress hereby declares that it is imperative to increase and train the personnel of the armed forces of the United States." § 1 (a), 54 Stat. 885; 50 U. S. C. App. § 301 (a).

There cannot have been many instances in our national life when Congress stamped its legislation as "imperative." And history has amply underscored the desperate urgency. Congress deemed it imperative to secure a vast citizen army with the utmost expedition. It did so with due regard for the individual interests by giving ample opportunities, within the elaborate system which it established, for supervision of the decisions of the multitudinous draft boards on the selection of individuals for service. As to such legislation, even were the language not explicit, every provision of the Act should be construed to promote fulfillment of the imperative need which inspired it. Surely it would hamper the aim of Congress to subject the decisions of the selective process in determining who is amenable to service to reconsideration by the cumbersome process of trial by jury, admirably suited as that is for the familiar controversies when the nation's life is not at stake. To avoid such a palpable inroad upon Congressional purpose, we need not draw on implications. We must merely resist unwarranted implications that sterilize what Congress has expressly required.

In construing the Act, this Court has heretofore applied the reasons which led Congress to rely wholly on the Selective Service System in determining the rights of individuals. This is what we said two years ago:

> "To meet the need which it felt for mobilizing national manpower in the shortest practicable period, Congress established a machinery which it deemed efficient for inducting great numbers of men into the armed forces. Careful provision was made for fair administration of the Act's policies within the framework of the selective service process."

We so ruled in *Falbo* v. *United States*, 320 U. S. 549, 554. That was a case in which we held that a challenge to a

local board's classification cannot be raised upon a trial like the present for violation of the Court's order, where the registrant disobeys the order before he is accepted for national service. But the Congress made the decisions of the board "final" without regard to the stage at which the registrant disobeys it. The command of Congress makes the decision of the board no less final after the registrant has submitted to the pre-induction examination than before such submission. The finality of the board is neither diminished, nor the authority of the courts to review such decision enlarged, because a registrant flouts the Selective Service process at an early or at a late stage. The language of the statute is unqualified and all-inclusive: "The decisions of such local boards shall be final except where an appeal is authorized in accordance with such rules and regulations as the President may prescribe."

Such has been the construction of more than forty judges in the circuit courts of appeals.[1] The question raised by the facts of this case has come before the Circuit Courts of Appeals for the First, the Second, the Third, the Fourth, the Fifth, the Sixth, the Seventh and the Eighth

---

[1] This is a list of the judges:

*First Circuit:* Mahoney, Woodbury, Peters.

*Second Circuit:* Learned Hand, Swan, Augustus N. Hand, Chase, Clark, Frank, Simons, Hutcheson (the last two sitting as designated judges).

*Third Circuit:* Jones, Maris, Goodrich, McLaughlin, Parker (the last sitting as a designated judge).

*Fourth Circuit:* Parker, Soper, Dobie, Northcott.

*Fifth Circuit:* Sibley, Hutcheson, Holmes, McCord, Waller, Lee, Strum.

*Sixth Circuit:* Hicks, Simons, Hamilton, Martin.

*Seventh Circuit:* Evans, Sparks, Major, Kerner, Minton, Lindley, Briggle.

*Eighth Circuit:* Sanborn, Woodrough, Thomas, Johnsen, Riddick.

Since *Falbo,* the only contrary views have been expressed by Judges Biggs and Leahy in the court below in No. 292.

Circuits. All, eight of them, have ruled that judicial re-view of a draft board classification is not available, in a criminal prosecution, even though the registrant has submitted to the pre-induction physical examination. *Sirski* v. *United States,* 145 F. 2d 749 (C. C. A. 1st, 1944); *United States* v. *Flakowicz,* 146 F. 2d 874 (C. C. A. 2d, 1945); *United States* v. *Estep,* 150 F. 2d 768 (C. C. A. 3d, 1945); *Smith* v. *United States,* 148 F. 2d 288 (C. C. A. 4th, 1945); *Koch* v. *United States,* 150 F. 2d 762 (C. C. A. 4th, 1945); *Fletcher* v. *United States,* 129 F. 2d 262 (C. C. A. 5th, 1942); *Klopp* v. *United States,* 148 F. 2d 659 (C. C. A. 6th, 1945); *United States* v. *Rinko,* 147 F. 2d 1 (C. C. A. 7th, 1945); *Gibson* v. *United States,* 149 F. 2d 751 (C. C. A. 8th, 1945).[2] Such was the impact of this Court's reasoning in the *Falbo* case that it greatly influenced the ruling of the Circuit Courts of Appeals as to the finality of local board orders and practically silenced whatever doubts may theretofore have been held by a few of the judges.

That it was during the crucial war years that the Act was thus interpreted and enforced, whereby the raising of the armed forces was saved from obstruction by not subjecting the Selective Process to judicial review when Congress forbade it, is of course no reason for misconstru-

---

[2] See, also, *United States* v. *Kauten,* 133 F. 2d 703 (C. C. A. 2d, 1943); *United States* v. *Nelson,* 143 F. 2d 584 (C. C. A. 2d, 1944); *United States* v. *Grieme,* 128 F. 2d 811 (C. C. A. 3d, 1942); *United States* v. *Bowles,* 131 F. 2d 818 (C. C. A. 3d, 1942), *aff'd on other grounds,* 319 U. S. 33; *Goodrich* v. *United States,* 146 F. 2d 265 (C. C. A. 5th, 1944); *United States* v. *Mroz,* 136 F. 2d 221 (C. C. A. 7th, 1943); *United States* v. *Messersmith,* 138 F. 2d 599 (C. C. A. 7th, 1943); *United States* v. *Daily,* 139 F. 2d 7 (C. C. A. 7th, 1943); *United States* v. *Sauler,* 139 F. 2d 173 (C. C. A. 7th, 1944); *United States* v. *Van Den Berg,* 139 F. 2d 654 (C. C. A. 7th, 1944); *United States* v. *Fratrick,* 140 F. 2d 5 (C. C. A. 7th, 1944); *United States* v. *Baxter,* 141 F. 2d 359 (C. C. A. 7th, 1944); *United States* v. *Domres,* 142 F. 2d 477 (C. C. A. 7th, 1944); *Bronemann* v. *United States,* 138 F. 2d 333 (C. C. A. 8th, 1943); *Van Bibber* v. *United States,* 151 F. 2d 444 (C. C. A. 8th, 1945).

ing it now and relaxing the mode of administration which Congress deemed necessary for its effectiveness.

Congress not only so willed but those especially entrusted with formulating this legislation were fully aware of the judicial consequences of what it prescribed. This is shown by an authoritative report of the House Committee on Military Affairs when that Committee, the originator of the Act, was considering amendments on renewal of the Act. In its report in January, 1945, more than four years after the Act had been in operation, the Committee thus stated with accuracy and acquiescence the unanimity of judicial decisions in support of the respect by the judiciary of finality of the decisions of the draft board:

> "Under the act as it is now written, registrants who are ordered to submit to induction into the armed forces may not refuse and defend such refusals in a criminal prosecution on the ground that their classifications were not given fair consideration by their boards. In order to obtain a judicial determination of such issues such registrants must first submit to induction and raise the issue by habeas corpus." H. R. Rep. No. 36, 79th Cong., 1st Sess. (1945) 4–5.

Congress wanted men to get into the army, not to litigate about getting in. And so it legislated on the assumption that its carefully devised scheme for determining within the Selective Service System, who was under duty to serve in the army would go awry too seldom to justify allowance of review by the courts. If challenges to such determination by the Selective Service System were found baseless, as they were so found as a matter of experience in all but a negligible number of instances, the men having submitted to induction would be in the army, available as such, and not in prison for disobedience. Accordingly, Congress legislated to discourage obstruction and delay through dilatory court proceedings that would

have been inevitable if judicial review of classification had
been afforded during the war years.

The Court finds support for its reading that "final" does
not mean final in the fact that not even at a time of our
greatest national emergency was the writ of *habeas corpus*
withdrawn as the ultimate safeguard of personal liberty.
See U. S. Constitution, Art. I, § 9, cl. 2; 1 Stat. 81, as
amended, 28 U. S. C. § 451. But this general right to
question the entire want of a legal foundation for a re-
straint is no measure of the issues that Congress left open
for determination in a jury trial for disobedience of orders
of the local draft boards made "final" by § 10 (a) (2).
Still less can it justify nullification of an explicit direc-
tion by Congress that such orders shall finally be deter-
mined within the framework of the Selective Service Sys-
tem. The issues in a *habeas corpus* proceeding are quickly
joined, strictly limited and swiftly disposed of by a single
judge. See 14 Stat. 385; 28 U. S. C. § 465. *Habeas cor-
pus* proceedings are freed from the cumbersomeness which
is a proper price to pay for the countervailing advantages
of jury trials in appropriate situations. *Habeas corpus*
"comes in from the outside," after regular proceedings
formally defined by law have ended, "not in subordination
to the proceedings, and although every form may have
been preserved opens the inquiry whether they have been
more than an empty shell." Holmes, J., dissenting in
*Frank* v. *Mangum*, 237 U. S. 309, 346. *Habeas corpus,*
after conviction, could not, of course, serve as a revisory
process of the determination of classification which Con-
gress lodged with finality in the draft boards. It could
only be used in those hardly conceivable situations in
which the proceedings before the draft board were a mere
sham, "nothing but an empty form." *Ibid.* The availa-
bility in such a remote contingency of *habeas corpus* even
after conviction is certainly no reason for deflecting and
confusing a trial for the simple issue defined by § 11,

namely, whether there was a wilful disregard of an order made by the Selective Service System, a system ranging from the local board to the President. It is one thing for the writ of *habeas corpus* to be available even though an administrative action may otherwise be "final." See *e. g.*, *Ng Fung Ho* v. *White*, 259 U. S. 276. It is quite another to interpolate judicial review and thereby to disrupt a whole scheme of legislation under which millions of orders need promptly to be made and promptly to be respected and were therefore endowed with finality when sanctions for disobedience are sought.

Another ground for denying the evident purpose of Congress and disregarding the terms in which it expressed that purpose, is the suggestion that the validity of a clas-. sification goes to the "jurisdiction of the board" to issue an order to report for induction. But Congress did not say that "the decision of such local boards *when properly acting under their authority* shall be final." It said simply and unqualifiedly "The decisions of such local boards shall be final . . ." To be sure local boards are given power to act "within their respective jurisdictions." But all agencies upon which Congress confers authority have such authority impliedly only "within their respective jurisdictions." If that inherent limitation opened the door to review of their action in every enforcement proceeding despite provisions for finality, a provision of finality is meaningless.

This argument revives, if indeed it does not multiply, all the casuistic difficulties spawned by the doctrine of "jurisdictional fact." In view of the criticism which that doctrine, as sponsored by *Crowell* v. *Benson*, 285 U. S. 22, brought forth and of the attritions of that case through later decisions, one had supposed that the doctrine had earned a deserved repose. In withholding judicial review in the situations with which we are concerned, Congress was acting upon the conviction that it was dealing with

matters which were more fittingly lodged in the exclusive discretion of the Selective Service System. Even in cases of far less exigency, Congress has chosen to act on such a view. See, e. g., *Gray* v. *Powell*, 314 U. S. 402; *Final Report of the Attorney General's Committee on Administrative Procedure* (1941) 86. But the short answer to any claim of reviewability drawn from the confinement of the local boards to action "within their respective jurisdictions" is that Congress was concerned with geography and not with law. Throughout this Act, the term "jurisdiction" has this geographic connotation. Is it reasonable to believe that Congress, bent on creating a vast armed force as quickly as possible, would in effect authorize every order of the Selective Service System to be reconsidered upon trials for disregard of such orders? The Act does not differentiate between the power of the board to allow exemptions and its power to grant deferments. The boards were invested with final authority to determine such matters subject only to such review as the Act authorizes. When Congress talked about a board acting within its jurisdiction it meant that a registrant had submitted his papers to a board either because he resided within its area or for some other relevant reason had registered with it.

For five years the circuit courts of appeals have construed § 10 (a) (2) to mean that Congress established a system for organizing a vast citizen's army, the selection of which shall be in civilian boards with such control over them as the President may formulate. Designed obstruction of this means of meeting the great emergency was made an offense. That the Congress had the Constitutional power to do so needs no argument at this late date. See *Selective Draft Law Cases*, 245 U. S. 366; *Hirabayashi* v. *United States*, 320 U. S. 81, 93. And yet the Court today holds that eight circuit courts of appeals were wrong in reading the language of Congress as Congress wrote it,

even though in doing so these courts were respectful of the considerations that moved Congress to write the Act as it did in order to raise that army. If this be so, not only were they wrong, but probably hundreds of convictions for disobedience of local board orders based on such regard for what Congress had written, were invalid.

## II.

Since Congress has made final the decision of a local board on a claim of exemption, its decision as to exemption cannot be reopened upon a trial for disobedience of the board's order. But Congress also authorized an appeal from the local board to an appeal board and ultimately to the President. Congress has not given to the local board authority to decide when such statutory rights of appeal may be availed of, nor to make "final" unwarranted action by a board whereby such appeal is frustrated. Cf. *Tung* v. *United States,* 142 F. 2d 919 (C. C. A. 1st, 1944). Accordingly, if a registrant does not obey an order of induction because the board has cut off the opportunity which the statute gives him to appeal to higher authority, his obligation of obedience has not yet matured. Therefore he has not failed to discharge his obligation under the Act. The duty to obey is not merely a duty to obey an order of the draft board, but to obey such an order after it is no longer subject to review within the Selective Service System. "The decisions of such local boards shall be final except where an appeal is authorized in accordance with such rules and regulations as the President may prescribe." Estep made the claim that he was effectively denied the right to appeal in addition to his inadmissible defense that the local board classified him improperly. He offered to prove that for all practical purposes the local board frustrated his right to have his case go to the appeal board, in violation of the board's duty under the Act and the Regulations. Estep should have been allowed to make

proof of this claim by appropriate motion to be disposed of by the court. As in situations of comparable legal significance, a trial court may, of course, leave controverted issues of fact to the jury.

Another issue is presented by the petitioner in No. 66. The indictment alleges a failure to report for induction. While the petitioner did not report at the local board as he was ordered to do, he was forcibly taken to the induction center and went through the pre-induction physical examination but subsequently refused to submit to induction. An order to report for induction, as we said in *Billings* v. *Truesdell,* "includes a command to submit to induction." 321 U. S., at 557; *United States* v. *Collura,* 139 F. 2d 345 (C. C. A. 2d, 1943). There is, however, basis for the petitioner's contention that the case was tried and submitted to the jury on the theory that he failed to show up at his local board. He substantially complied with that request by being at the induction center for examination. The trial court's charge is at best ambiguous. The court more than once apparently charged not that he did not submit to induction, but that he failed to appear voluntarily at the induction points. "A conviction ought not to rest on an equivocal direction to the jury on a basic issue." *Bollenbach* v. *United States,* 326 U. S. 607. On this ground the conviction is properly reversed.

Mr. Justice Burton, with whom Mr. Chief Justice Stone concurs, dissenting.

The Chief Justice and I think that the judgment of conviction in these cases should be affirmed for reasons stated in Part I of Mr. Justice Frankfurter's opinion.

We think that under § 10 (a) (2) of the Selective Service Act, rightly construed, the registrant is required, on pain of criminal penalties, to obey the local board's order to report for induction into the armed forces, even though the board's order or the action of the appeal board on

which it is based, is erroneous. "In order to obtain a judicial determination of such issues such registrants must first submit to induction and raise the issue by habeas corpus." H. Rep. No. 36, 79th Cong., 1st Sess. (1945) 5. It follows that if the registrant is indicted for disobedience of the board's order he cannot defend on the ground that the draft procedure has not been complied with or, if convicted, secure his release on that ground by resort to habeas corpus. The result is that such relief is open to him only if he obeys the order and submits to induction, when he is free to seek habeas corpus.

We do not find in the record of either case sufficient basis for reversal thereof on the grounds suggested in Part II of MR. JUSTICE FRANKFURTER's opinion.