**UNITED STATES of America,**
**Plaintiff,**

v.

**Colin Bruce SCOTT, Defendant.**

**No. 55–CR–53.**

United States District Court
E. D. Wisconsin.

Feb. 1, 1956.

Edward G. Minor, U. S. Atty., by Howard W. Hilgendorf, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff.

James R. Mattison, Milwaukee, Wis., for defendant.

GRUBB, District Judge.

The indictment charges defendant with a violation of the Universal Military Training and Service Act of 1948, 50 U.S.C.A.Appendix, § 451 et seq., more particularly with failing to remain at civilian work contributing to the maintenance of the national health, safety or interest for a period of twenty-four consecutive months.

The defendant claimed that he was innocent of any such violation for three reasons: (1) that his Draft Board had acted arbitrarily and capriciously in failing to classify him as a minister; (2) that it was the duty of said Board to reopen and consider anew the defendant's classification in view of new and additional evidence filed with the local Board showing that he was a full-time minister, and the failure to reopen was arbitrary, capricious and an abuse of discretion; and (3) that the Board deprived the defendant of procedural due process of law by failing to have posted conspicuously at the office of the local Board the names and addresses of advisors to registrants, as required by Section 1604.41 of the regulations in effect at said time.

The defendant waived a jury and trial was had before the court. He stipulated that his entire selective service file be admitted into evidence and further stipulated that he did enter into the employment ordered by his Draft Board on the 2nd day of November, 1953, and that he left such employment on August 3, 1954, prior to the time specified in the Draft Board order.

On February 6, 1952, Draft Board No. 60 of Racine County, Wisconsin, received the defendant's draft registration questionnaire. At that time Scott asked for a classification of 1–O–minister. In the questionnaire Scott stated that he had just returned from out west; that he was studying—not full time, and looking for a job; that he had had various enumerated odd jobs; that his prior work experience included that of a full-time minister. On April 10, 1952, Scott's conscientious objector form was received by the Board. On the same day Alfred Schnabl, the chief minister of the Jehovah's Witnesses congregation in Racine, Wisconsin, wrote a letter to the Draft Board informing the Board that Scott had been entered as a pioneer minister by the Watchtower Bible Society of New York but that Scott would be delayed in taking up his duties as a pioneer until some debts were paid off.

On April 12, 1952, Scott was classified 1–O, that is, as a conscientious objector. Scott has no objection to that classification. Thereafter during August and September of 1952, a series of letters were written to the Draft Board by per-

sons purporting to know Scott personally in which claims were made that Scott was a full-time ordained minister. Those letters were stamped by the Draft Board as received on September 17, 1952. It was stated in a letter submitted by one James Smith that Scott was as of August 11, 1952, serving one hundred hours per month in the service of God and that Scott desired to enroll in an advanced missionary school. A second letter from Alfred Schnabl contained the information that Scott had "just recently joined the ranks of the full time pioneer ministers" and that he had Watchtower Society recognition. The defendant himself wrote a letter to the Racine Draft Board on September 16, 1952, most of which dealt with Biblical quotations. The defendant did state the following however:

"I would very much like to be classified as a minister so I could continue my house to house preaching, my street work, my Bible Studies which I have with honest hearted persons, my back calls on sincere persons, and my own study at home and at the local congregation. In the local congregation I am enrolled in the Theocratic Ministry School which is a school to train one how to effectively 'preach the word'. (2 Timothy 4:2.) I give Bible talks which range from 8 to 15 minutes. A very qualified instructor counsels each speaker on his good and weak points.

\*   \*   \*   \*   \*   \*

"I plan to attend the Bible School of Gilead when I am eligible. First I have to be a full-time minister or pioneer which is a minimum of 100 hours a month. I must do this for two years. After I graduate from this school I will be sent to a foreign country to become a missionary in that land. If I am classified sincerely and correctly I will be able to follow through with these plans."

That letter failed to mention any appointment of Scott as a pioneer minister, his work schedule, if any, or the amount of time which he was spending as a claimed full-time minister.

On October 6, 1952, the Scott case was reopened by the Draft Board, apparently on the basis of the letters submitted after April 12, 1952. The Board once again classified Scott as a conscientious objector. The defendant did not request a personal appearance or appeal from the decision of the Draft Board within the ten days allotted by law for such action.

On April 2, 1953, the defendant was found physically acceptable. The defendant wrote a letter to the Racine Draft Board on April 13, 1953, and enclosed a conscientious objector questionnaire not filled out. In that letter the defendant requested a personal appearance before the Board to show that he was in fact a minister. He stated:

" \*   \*   \* about nine months ago I did enter the full time ministry. The congregation at Racine, Wisconsin and also Aurora, Illinois, with which I am at present associated, recognizes me as an ordained minister. \*   \*   \* I am working under their (Watchtower Society) direction and because they recognize me as a minister they have assigned me to work with the Aurora, Illinois congregation."

On April 20th the defendant submitted a second letter to the Draft Board. He again stated that he was a full time ordained minister and that he desired a personal appearance.

On April 22, 1953, the Draft Board informed the defendant that his letters were read at a Board meeting held April 20th; that his case was reviewed but not reopened, and that his classification remained 1–O.

The defendant filled out a special report for Class 1–O registrants filed May 4, 1953, in which he listed a number of part-time jobs as well as one full-time job.

On July 13, 1953, the defendant filed Form SSS No. 151, Application of Vol-

unteer for Civilian Work. The application read as follows:

"I hereby volunteer for civilian work * * * and request that I be ordered to perform this work * * *. For this purpose, I waive all rights of personal appearance and appeal if I am classified as available for such civilian work, and I consent to my being ordered to perform this work at any time convenient to the Government."

The defendant on October 22, 1953, was sent an Order to Report for Civilian Work and Statement of Employer and was assigned to work at the Racine County Hospitals and Home. He began working at said hospital on the 2nd of November, 1953. No further correspondence was had with his Draft Board. However, on August 3, 1954, the Draft Board was notified by the Racine County Hospitals and Home that the defendant had left their employ. On August 21, 1954, the defendant wrote a letter to his Draft Board informing the Board that he had terminated his employment at the Racine County Hospital. He stated, among other things, that he felt that he deserved a minister's classification and that his work as a civilian duty worker interfered with his ministry. He also requested a minister's classification.

A number of contentions have been brought forward by both the government and the defendant concerning various issues which arose in connection with the defendant's Draft Board history. The court believes that the facts surrounding the Draft Board's failure to reopen Scott's classification on April 20, 1953, is of prime importance in determining Scott's innocence or guilt. 32 Code of Federal Regulations, Sec. 1625, contains the specific regulations pertaining to applications for considering anew a registrant's classification.

"§ 1625.1 *Classification not permanent.*

"(a) No classification is permanent.

\*　　\*　　\*　　\*　　\*　　\*

"(c) The local board shall keep informed of the status of classified registrants. Registrants may be questioned or physically or mentally re-examined, employers may be required to furnish information, police officials or other agencies may be requested to make investigations, and other steps may be taken by the local board to keep currently informed concerning the status of classified registrants.

"§ 1625.2 *When registrant's classification may be reopened and considered anew.* The local board may reopen and consider anew the classification of a registrant (1) upon the written request of the registrant, the government appeal agent, any person who claims to be a dependent of the registrant, or any person who has on file a written request for the current deferment of the registrant in a case involving occupational deferment, if such request is accompanied by written information presenting facts not considered when the registrant was classified, which, if true, would justify a change in the registrant's classification; * * *."

■■ The due process of law question relating to 32 Code of Federal Regulations, § 1625.2, has been determined recently in United States v. Ransom, 7 Cir., 1955, 223 F.2d 15, 17, in which the court stated:

"It has been firmly established by the Supreme Court that when a registrant makes a prima facie showing for a desired classification, the board may not deny him that classification unless it has a 'basis in fact' for the denial. Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132; Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567. Selective Service System regulations recognize that 'no classification is permanent' (32 C.F.R. § 1625.1), and empower the local board to 'reopen and consider anew the classification of a regis-

trant (1) upon the written request of the registrant, * * * in a case involving occupational deferment, if such request is accompanied by written information presenting facts not considered when the registrant was classified, which, if true, would justify a change in the registrant's classification; * * *.' (32 C.F.R. § 1625.2) We think that the rule requiring a basis in fact for the action of the board in making the original classification, as announced in Dickinson and Estep is equally applicable to the action of the board in determining whether or not changed conditions justify a reopening of the registrant's classification and consideration of his claim to a different classification. The local board should not be able to escape the requirement of a basis in fact by simply refusing to reopen a registrant's file and consider it further. If a registrant makes a prima facie showing of right to a new classification, the board cannot refuse to give it to him unless it has at least a basis in fact for that refusal. We regard this as a necessary corollary to, if not the same as, the rule laid down in the Estep and Dickinson cases, supra.

"If a registrant presents a prima facie case for a new classification, the mere fact that his file has previously been closed is not a basis in fact for refusing the requested classification. When such a prima facie case is presented and the board has no basis for refusing the requested classification, it must investigate further. If further investigation fails to disclose any basis for refusing the registrant's requested classification, it must be granted."

In order to apply the test laid down in the Ransom case, it is necessary to carefully study the information before the Draft Board when it made its decision not to reopen the Scott file on April 20, 1953. The Draft Board had previously reopened Scott's file on October 6, 1952.

The information before the Board at that time consisted of Scott's questionnaire, a letter from Scott in which he stated very little factual information, and letters from various officials and members of Jehovah's Witnesses.

April 9, 1953, Scott wrote a letter to the Draft Board which contained statements never before presented to the Board by Scott. He states that he did not appeal for a minister's classification because he was not during the appeal time engaged in the full-time ministry, listing financial obligations and the death of his father as reasons which had previously prevented him from taking up the full-time ministry. Scott goes on to state that nine months previously he did enter the "full time ministry," that he is working under the direction of the Watchtower Bible and Tract Society, and that because the Watchtower recognized him as a minister it had assigned him to work with an Illinois congregation. He requested a personal appearance in order to present additional facts.

After reviewing Scott's selective service file carefully it is the opinion of this court that on April 9, 1953, the defendant did present new facts not considered by the Draft Board in its classification of October 6, 1952, which, if true, created a prima facie showing of ministerial status in the absence of contradictory information available to the Draft Board. The court has been unable to find any evidence whatsoever contradicting the statements which Scott made in his letter of April 9, 1953. The Draft Board had no basis in fact for refusing to reopen the Scott file. In Dickinson v. United States, 346 U.S. 389, 396–397, 74 S.Ct. 152, 157–158, 98 L.Ed. 132, the Supreme Court stated:

"If the facts are disputed the board bears the ultimate responsibility for resolving the conflict—the courts will not interfere. Nor will the courts apply a test of 'substantial evidence.' However, the courts may properly insist that there be some proof that is incompatible with the registrant's proof of exemption.

\* \* \* But when the uncontroverted evidence supporting a registrant's claim places him prima facie within the statutory exemption, dismissal of the claim solely on the basis of suspicion and speculation is both contrary to the spirit of the Act and foreign to our concepts of justice."

■ We believe that Draft Board No. 60 of Racine County, Wisconsin, had no basis in fact for refusing to reopen Scott's file, and lacking such a basis in fact, the Draft Board should have investigated further with the result that it either acquired a basis in fact for not reopening the file or granted a minister's classification to Scott.

■ It further appears to us that Scott did exhaust his administrative remedies. When the Draft Board refused to reopen his classification on April 20, 1952, Scott was denied any right of appeal. See United States v. Ransom, supra.

The government takes the position that regardless of any irregularity in the proceedings of the Draft Board and regardless of whether defendant's rights were violated, his signing the Application of Volunteer for Civilian Work was a waiver of any such irregularity.

With reference to the signing of this application, the defendant testified on cross-examination as follows:

"Q. Let me ask you this: Did you sign the application for volunteer civilian work which is in the file, and of which I now show you a photostatic copy? A. I signed it because I thought I had to or go to prison, so I thought I could fulfill my duties as a minister better at that job than I could—

"Q. Mr. Scott, at the time you signed that you were classified as '1-O'; is that right? A. That's right.

"Q. What did this mean with regard to service in the Armed Forces? A. It meant I was exempt.

·"Q. Why would you have to go to prison if you didn't sign this? A. I thought you had to take that Government job; which they do, don't they?

"Q. I'm asking you. A. Well, I thought I was forced to take the job; I had to sign it or go to prison. That was my impression."

■ It is basic that in ordinary circumstances everyone is presumed to know the law. Here we have an unusual situation. It is recognized as unusual by the very fact that the regulations require Draft Boards to post names of advisors to whom registrants can go for advice. The government by that requirement in and of itself indicates that it does not expect these young men to have a thorough knowledge of the law and certainly not of the various regulations issued under it. This indicates that the government intends to protect the rights of these young men who are liable for service under the Selective Service Act. No advisors' names were posted in the instant case. In the case of United States v. Rolla Melvin Montee, D.C., 137 F.Supp. 381, decided herewith, this court held that the failure to post names of advisors was not prejudicial in the facts of that particular case. There no basic constitutional rights of the defendant had been violated. Here the court feels that such rights were violated. Had the names of such advisors been posted and had they been well advised, they might have informed the defendant that there is serious question as to whether his constitutional rights have not been violated by the failure of the Draft Board to grant him a hearing when he requested change of classification citing change of circumstances. Had they so advised him, he might probably not have signed the Application of Volunteer for Civilian Work. In this particular situation the court cannot find beyond a reasonable doubt that defendant was not prejudiced by the failure to have the names of advisors posted.

■ There is further question in the court's mind as to whether the sign-

ing of the Application of Volunteer for Civilian Work standing in and of itself would be enough to amount to a waiver of the constitutional rights of the defendant. Basically, a waiver is a voluntary relinquishment of a known right. Here the court cannot presume that the defendant knew his rights. Waivers and estoppels are effective basically for the reason that someone else has changed his position in reliance upon them. Here there is nothing to indicate that the Draft Board or the government changed its position in reliance upon the signing of the application. Furthermore, there is no "consideration" for the signing of the application. Defendant gained nothing by signing the application. He was still required to serve the same length of time in performing work contributing to the maintenance of the national health, safety or interest that he would have been required to serve had he not signed the application. The defendant might also strongly urge that he signed this application under "duress." To paraphrase from the language of Mr. Justice Frankfurter in United States v. Minker, 76 S.Ct. 281, the final action by the Draft Board, even though improvident, had some coercive tendency either because of ignorance on the part of the defendant of his rights or his natural respect for what appeared to be an official command. These concerns, relevant to the construction and effect of the signing of this application, are emphatically pertinent to and constitute an important step in proceedings under the Selective Service Act.

"In such a situation where there is doubt it must be resolved in the citizen's favor. Especially must we be sensitive to the citizen's rights where the proceeding is nonjudicial because of '(t)he difference in security of judicial over administrative action * * *.'"

For the foregoing reasons it is the verdict and judgment of this Court that the defendant, Colin Bruce Scott, is not guilty of the crime charged in the indictment.