Robert L. **WEISSMAN**, Petitioner,

v.

**OFFICER** of the Day, John Doe, Commanding Officer, Armed Forces Examination and Induction Station, Fort Hamilton, Brooklyn, New York, and Local Board No. 3, Respondents.

No. 70–C–657.

United States District Court, E. D. New York.

July 9, 1970.

Kazdin & Weinstein, New York City, for petitioner; David J. Weinstein, New York City, of counsel.

Edward R. Neaher, U. S. Atty., Eastern District of New York, for the United States; Lloyd H. Baker, Asst. U. S. Atty., of counsel.

ZAVATT, District Judge.

This is a petition for a writ of habeas corpus by one who submitted to induction and is now in the Armed Forces, stationed at Fort Hamilton, Brooklyn, New York, but on leave since the date of his induction pending a determination of his petition.

Pursuant to the Selective Service Act, 50 U.S.C. App. § 453, 32 C.F.R. § 1611.1, the petitioner registered with Local Board No. 3, Great Neck, New York, (Board) in March 1963. He was then a full-time student at Hofstra University, Hempstead, New York, and so reported to the Board in his Classification Questionnaire, dated January 31, 1964. The

Board classified the petitioner II–S, thereby granting him a student deferment. 50 U.S.C. App. § 456(h) (1), 32 C.F.R. § 1622.25. This classification continued from February 12, 1964 to March 19, 1969, when he was reclassified I–A.

When he applied in November 1967 for a continuation of his student deferment, he was a student at C. W. Post College of Long Island University (Post College) and had previously notified the Board in writing, by letter dated September 12, 1966, that he had "recently been married." He signed Selective Service System Form 104, "Request for Undergraduate Student Deferment," which included a copy of Section 6(h) (1) of the Selective Service Act of 1967, 50 U.S.C. App. § 456(h) (1) which provides, *inter alia*, that "No person who has received a student deferment under the provisions of this paragraph shall thereafter be granted a deferment under this subsection, * * * except for extreme hardship to dependents (under regulations governing hardship deferments), * * *." In that request and over his signature, petitioner alleged "I have read and understand the preceding provisions of the Military Selective Service Act of 1967 * * *."

On December 12, 1968, the Board received an undated letter from the petitioner advising it that (1) he is still a student at Post College; (2) "the inevitable has happened. My wife is pregnant"; (3) that his father must stop work on doctor's advice; (4) that he (petitioner) is "unexpectedly being hit with new financial burdens; Both my new coming family's and that of my parents" and requested permission to leave school and find a full-time job. Although he did not expressly request a hardship deferment, the Board mailed him SSS Form 118, Dependency Questionnaire. In the completed questionnaire filed with the Board on December 20, 1968, the petitioner claimed:

(1) that his wife, age 23, is totally dependent on him for support;

(2) that no member of the immediate families of petitioner or his wife can contribute to the support of his wife;

(3) that he has been employed part-time as a taxi driver, with average earnings of $50 per week, since October 1968;

(4) that his monthly obligations for "Rent, Food, Phone, Electric, Insurance, Gasoline, Loan" total $317 (of which $176 is for rent);

(5) that his pregnant wife is not employed;

(6) that his father has a serious heart ailment and will soon be forced to stop working;

(7) that petitioner "won't be able to support him fully but I feel I can be a big help to financial, and mental matters for my father";

(8) that by working part-time "I can't make ends meet."

He asked the Board for help and offered to furnish any needed further information, including "a dependent sheet on my father and mother in January or February * * *." It is to be noted that petitioner listed only his wife as a dependent in that questionnaire.

Following the receipt of this questionnaire, the Board requested the Nassau County Department of Welfare to make an investigation of the petitioner's "Request for deferment due to dependency or hardship" for the reason "Wife pregnant. Works part time and attends school part time." *See* 32 C.F.R. § 1621.-14.

The report of the Welfare Department, filed January 24, 1969, confirmed the wife's pregnancy (expected date of delivery June, 1969); the petitioner's part-time employment (but at $57 per week); his student status "with hopes of graduating in June 1969." It also reported petitioner's New York State Higher Education Loan, through the Franklin National Bank of "$900 per semester." It also reported the representations of petitioner's wife (1) that petitioner's par-

ents "cannot be of help"; (2) that her parents have been forced to sell their home because her father is handicapped; (3) that petitioner's parents are "selling their home because his father has cancer and cannot maintain it"; (4) that petitioner pays monthly rent of $176; (5) that the insurance premiums on his fully paid 1967 Pontiac are $18 per month. The Welfare Department stated that, according to "Welfare Standards Budget," the needs "For Mrs. Weissman, excluding the cost of medical, dental and debts" amount to $270.45 ("Income Unknown") and that "Circumstances for the family of registrant would be below public assistance standards if he were inducted or if he continued to be at home" (presumably with no income). The report concluded:

Note: According to present income for his family, registrant would be presumptively eligible for supplementary assistance at this time.

On March 19, 1969, the Board classified petitioner I–A and notified him that he could ask for a personal appearance or an appeal within thirty (30) days. See 32 C.F.R. § 1624.1. Within that period, petitioner wrote the Board an undated letter, received April 9, 1969, expressing his desire "to appeal my I–A classification * * * for the following reasons." He listed four reasons—the first three of which related to (1) his father's illness; (2) that "I am now aiding in his support"; (3) "To help him I have taken a job as an independent commission salesman." His fourth reason related to his wife. He merely stated "(4) My wife is expecting a baby in June." He requested "the chance to substantiate this evidence in a personal appearance as soon as possible."

The Board considered that, by this letter, petitioner was now claiming hardship for his father, in addition to the claim in December 1968 of hardship for his wife. For it wrote a letter to that effect and requested petitioner to fill out another Dependency Questionnaire with information relating to the alleged hardship that would be imposed on his father were the petitioner inducted into the Armed Forces. On April 14, 1969, the petitioner filed another Dependency Questionnaire in which he named his father and his wife as dependents; listed his wife as totally dependent upon him for support; claimed that "as of March 8, 1969" he was contributing to his father at the rate of $2400 annually; that his income from all sources during the last 12 months was $4200; that he started to work as an automobile salesman in March 1969; that he paid a monthly rent of $176 and that his other monthly obligations amounted to $59 for "Loan, Electric, Telephone"; that he does not claim his parents as a deduction on his income tax returns because his income as a taxi driver amounts to about $40 to $60 per week and that, as a car salesman, working only on commissions, no sums are deducted from his compensation by his employer. Further, that income tax is not payable until "The End of the year." This would suggest that he was saying that he did not commence to assist his father financially until March 1969 and that, at most, he was donating and intended to continue to donate $50 a week toward his father's support. So that, as of the date of this questionnaire he had contributed, according to his own claim, approximately $250 for his father's support. In response to the question as to why other close relatives could not assist his father, he stated that one sister, age 20, was a premedical student attending an "Out of Town School" and living in an apartment; that a brother, released from Army-Intelligence in October 1968 was "Just Able to Make Ends Meet" and that an older sister, a school teacher, age 30, was "Taking Leave of Absence Without Pay To do Social Studies Research In Europe."

With this questionnaire petitioner submitted the certification of a Dr. Panzarella that his wife was pregnant, "in a highly nervous and apprehensive state because of her husband's Draft Classification" and a letter of a Dr. Baliff with reference to the father's severe illness

(one lung, chronic bronchitis, pulmonary emphysema, heart disease) "His condition is at best, so tenuous that I feel it unwise to cause any undue aggravations to Mr. Weissman since this might result in his demise. I therefore think it unwise to take Mr. Robert Weissman into the Armed Forces and feel he is entitled to a compassionate deferrment [sic]."

In response to this questionnaire, the Board requested him to attend its next meeting and to submit, either prior to or at that meeting, "a written statement including any supporting documents outlining the reasons for your request for deferment." At the Board meeting of May 21, 1969, the petitioner submitted a written statement to the effect that:

(1) his father had stopped working and "I am trying to help him financially any way I can";

(2) his father is unaware of petitioner's I–A classification and "is seriously up-set by the thought of my having to go in the Armed Services" and "his doctor recommends not mentioning my problem to him until I have my status straighten [sic] out as any upset may cause serious side effects physically";

(3) his wife is pregnant and "under constant doctors watch because of nerves * * * she has been ill and upset since learning of my I–A classification";

(4) his wife's condition is "worsened by the fact that her father lost his arm during World War II and she has always lived in fear that some day this or worse could happen to her husband or sons."

Petitioner appeared before the Board for fifteen (15) minutes on May 21, 1969. He submitted the written statement above-referred to and was then asked the following questions and gave the following answers under oath:

Q. You requested a personal appearance, will you tell us about it.

A. I brought in a statement, and I sent in doctor's statements for my father and wife.

STATEMENT READ TO BOARD
MEMBERS

Q. Does your father have any income?

A. He has a disability pension and has some investments. He gets an income of about $563.00 a month.

Q. Does he own his own home?

A. No, he just sold it, as he's moving down south. The doctor told him he should live down there. They will live with my aunt and uncle there for awhile.

Q. How much do you contribute?

A. About $50.00 a week when I can. You see I sell cars and its on commissions, so it's hard to tell.

Q. You give $50.00 a week when he gets over $500.00 a month income.

A. He gets about $200.00 a month income from dividends, and $163.00 disability from Jonothan Logan. The $563.00 is with the $200.00 I give.

Q. What did your father do?

A. He was general production manager in clothing with Jonathan Logan clothes. My father's doctor is also my doctor, and he told me my father couldn't work much longer.

Q. You have two sisters and one is a student. Who finances her education?

A. My father does, and she will probably get scholarships. She also works in the summers. She's changing to nursing now, and will get a scholorship [sic] for that.

Q. You have another sister who is a teacher.

A. She is leaving on a sabbatical for a social studies program in Europe for a year and a half.

Q. You have another brother, is he married?

A. Yes, he's an actor, he doesn't make very much.

Q. Of all the children, you are the only one who can contribute?

A. My younger sister is in school, my other sister is taking off for Europe.

Q. Does your brother have any children?

A. No.

Q. Does anyone live at home with the folks?

A. No.

Q. Will you continue to contribute when they live in Florida?

A. They can't go on living with my aunt and uncle indefinitely, they want to build a house.

Q. Why can't your sister, who is a teacher, contribute?

A. My sister knows the situation but she's leaving for Europe on June 20th anyway.

Q. Then the burden falls on you. You went to college and requested the 2–S after July, 1967. What was your major at school?

A. Marketing. I went for 3½ years. When I got married my wife and I both got sick and I lost time at school.

Q. You started in 1963. How old are you now?

A. I'm 24.

Q. You asked for and received 2–S by signing SSS 104 prior to your marriage and your wife's pregnancy.

### APPEAL RIGHTS EXPLAINED

The Board's summary of this appearance by petitioner states that the petitioner "Desired classification 3–A." It does not specify whether the Board considered the application as one for a fatherhood 3–A deferment under 32 C.F.R. § 1622.30(a) or a 3–A hardship deferment under 32 C.F.R. § 1622.30(b). The Board again classified him I–A, by a 4–0 vote that evening. 32 C.F.R. § 1624.2(d).

The petitioner filed a notice of appeal on June 17, 1969. Pending this appeal, and before his file was forwarded to the Appeal Board on July 17, 1969, petitioner's child was born June 27, 1969. The Appeal Board classified him I–A on October 14, 1969; on October 24, 1969 he was ordered to report for an Armed Forces physical examination on November 10, 1969. On November 10, 1969, petitioner submitted to a physical examination at Fort Hamilton and was found acceptable for military service.

After petitioner had been found acceptable for service, and on November 17, 1969, he filed a report of his wife's psychologist stating it to be his "judgment, a postponement of Mr. Weissman's induction would safeguard his wife's condition and permit him to ultimately render greater service to his country."

On January 20, 1970, the Board ordered petitioner to report for induction on February 4, 1970. After a cancellation of that order, and other delays (not here relevant), petitioner was ordered on May 21, 1970 to report for induction on May 25, 1970.

The same day petitioner submitted to induction, he filed a petition for a writ of habeas corpus, claiming, *inter alia*, that there was "no basis in fact" for his original I–A classification. *See* United States v. Weintraub, 429 F.2d 658 (2d Cir. decided June 23, 1970). A hearing was held by the court, at which Vincent J. Floriani (Floriani), a member of the Board, testified that he was present at the registrant's personal appearance of May 21, 1969 and that he was familiar with this case (Tr. p. 6).

In response to questions calculated to ascertain "how the Board operates" at personal appearances and, specifically, with reference to applications for hardship deferments, Floriani testified that the Board examines the contents of the file (including letters from the registrant and documentation of the claim "and in addition thereto, if he has made

a personal appearance, we interrogate him and question him as to those items that he is claiming" (Tr. pp. 3–4). "There is no general policy, we evaluate him on an individual basis" (Tr. p. 101).

In response to specific questions regarding the Board's denial of petitioner's claim for a III–A classification, Floriani stated, generally, that the record as a whole did not constitute extreme hardship (Tr. p. 39). He also replied that the Army allotment to the wife and child was a factor (Tr. pp. 37–38, 175–176), and that the Board considered that the registrant "could possibly be O.C.S. material because of his college education" (Tr. pp. 175, 199–200). However, the Board only presumes that an O.C.S. application would be made and does not "know for a fact whether he would be accepted by the army" (Tr. p. 177). The Board also considered the fact that the wife could work "and she would presumably, if somebody would be able to mind the child, be able to go to work" (Tr. pp. 188–189).

It is undisputed, as the summary of the personal appearance indicates, that not one question was asked of the registrant regarding his claim of total financial dependency of his wife (Tr. pp. 190–197). Asked why this was not done, despite registrant's claim in *both* dependency questionnaires that his wife was totally dependent on him, Floriani testified at the hearing that, "I don't think Mr. Weissman himself was too concerned about that " [his claim of his wife's hardship] (Tr. p. 126). To explain this, Floriani pointed to the petitioner's letter received April 9, 1969, in which he requested a personal appearance, and noted that "he is not attaching that importance" [to his claim of his wife's dependency], because "[I]t appears he put that on the bottom of the letter, therefore, we took into consideration how much importance he attached to it" (Tr. p. 128, *see also*, pp. 130, 134–143). Floriani also pointed to the statement submitted at the personal appearance (Tr. p. 129), noting that it did not

mention the wife's financial condition (Tr. p. 130).

The only question asked of petitioner at his personal appearance concerning his wife, related to her pregnancy:

"Q.  You asked for and received a 2–S by signing SSS 104 prior to your marriage and your wife's pregnancy." (Tr. p. 134, *see also*, summary of personal appearance.)

Floriani also stated that he does not know if the Welfare Department gives welfare assistance "for army personnel" (Tr. p. 146).

*Was there a "basis in fact" for the original I–A classification?*

■  The "basis in fact" test was enunciated by the Supreme Court in Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946):

\* \* \* the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant. 327 U.S. at 122–123, 66 S.Ct. at 427.

Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953); Carlson v. United States, 364 F.2d 914 (10th Cir. 1966). The *Estep* test of "basis in fact" has been incorporated into the Act. 50 U.S.C. App. § 460(b) (3). "[T]he range of review is the narrowest known to the law." Blalock v. United States, 247 F.2d 615 at 619 (4th Cir. 1957). To meet it, the registrant must show that the action by the local board was arbitrary and capricious. *Weintraub, supra.*

In determining whether the local board had a "basis in fact" for its classification, the district court's task is made exceedingly difficult by the fact that

neither the Act, nor the regulations, expressly require the local board, [see 32 C.F.R. § 1624.2(d)] or the Appeal Board [see 32 C.F.R. § 1626.26, 27] to state the basis of its decision. *See* United States v. Broyles, 423 F.2d 1299 (4th Cir. March 19, 1970). The only exception, created by judicial decision is in certain conscientious objector cases, *see* *Broyles, supra*; United States v. James, 417 F.2d 826, 831 (4th Cir. 1969); United States v. Washington, 392 F.2d 37, 39 (6th Cir. 1968); United States v. Lonseth, 300 F.Supp. 857 (D.Or.1969). The Second Circuit, however, does not support this limited exception. United States v. Messinger, 68 CR 333 (E.D. N.Y. Jan. 30, 1969), aff'd, 413 F.2d 927, 930 (2d Cir. 1969).

■ Thus foreclosed from reliance upon a statement of the Board as to its reasons for denying registrant his III–A classification, the court must look to the file and the testimony of the Board member. *Cf.* United States v. Gearey, 379 F.2d 915 (2d Cir. 1967), to see if there was a "basis in fact" for petitioner's classification.

■ Assuming, arguendo, that there was a "basis in fact" for the Board's denial of a III–A classification based upon the alleged dependency of the father (and the record clearly indicates such a basis in fact), the court finds that the record, including the file and Floriani's testimony, does not support the Government's contention that there was a "basis in fact" for denying the claim of total dependency of the wife. In fact, the court finds that the Board never considered the claim of the wife's dependency.

■ The information submitted by the petitioner to the Board clearly established a prima facie case of hardship due to the financial dependency of the wife: She was about to give birth; was not working; her husband was in debt; she could not rely on the support of any members of her or his immediate family because they had pressing problems of their own. The Welfare report indicated the hardship to her when it concluded that Mrs. Weissman would qualify for welfare should her husband be inducted. However, the Board obviously did not rely on the report's findings that she would qualify for assistance, because Floriani admitted that he did not know whether army personnel qualify for relief (Tr. p. 146).

■ The Board was justified in considering army allotments, 32 C.F.R. § 1622.30(d), but the regulations specifically provide that such allotments are not conclusive. 32 C.F.R. § 1622.30(d). The allotment to the family of a private could not have met the wife's and child's minimum requirement. Floriani suggested that the fact that the registrant could have been O.C.S. material was a factor— yet it is common knowledge that not every applicant for O.C.S. is accepted (Floriani admitted that the possibility of rejection was *not* considered, Tr. p. 177) nor did Floriani know the length of time it takes for an O.C.S. applicant to become an officer (Tr. p. 38). In light of the possibility that petitioner would not have been accepted, and Floriani's lack of knowledge regarding O.C.S. applications, the court cannot find a "basis in fact" on this ground.

The court cannot accept Floriani's suggestion that the Board relied on the fact that Mrs. Weissman could have worked to lessen the hardship because she was not incapacitated and had family in the area who would mind the child (Tr. pp. 188–189). The information before the Board indicated that both his parents and hers were beset with significant problems of their own. In this light, it would be unreasonable for the Board to assume willy-nilly (and without so much as asking a single question in this regard), that either family could take on the added burden of caring for a newborn baby.

Nor is there any indication in the file or in Floriani's testimony that the Board disbelieved *any* of the information submitted by the registrant as to his wife's dependency.

It would appear that, since the registrant established a prima facie case of his wife's dependency, the Board would have and should have asked him some questions about that claim if, in fact, it was ever considered.

Floriani's explanation for this omission was that the Board concluded that petitioner himself did not attach importance to his claim regarding his wife. The Board rested this determination on the letter submitted at the personal appearance, and his letter received April 9th in which he requested a personal appearance. However, in light of the two dependency questionnaires (in which he claimed his wife as a total dependent) and the Welfare report, the Board's conclusion that Weissman regarded the claim as unimportant must be deemed arbitrary.

The only question asked of registrant at his personal appearance, other than those regarding his father, concerned the SSS 104 form he had signed in 1967 when requesting a student deferment. By this form, he waived his right to a fatherhood exemption as provided in the regulations, 32 C.F.R. § 1622.30 (a), but did not thereby waive his right to claim extreme hardship, 32 C.F.R. § 1622.30(b). The only possible reason the Board would have asked him this question, would be if it thought that he was requesting a fatherhood exemption (Tr. pp. 135–136). The Board may have been led to this conclusion by petitioner's letter received April 9, 1969 in which he asked for a personal appearance after he had been classified I–A in March. However, everything submitted prior and subsequent to this letter indicated clearly that petitioner was seeking a III–A, not due *ipso facto* to his wife's pregnancy, but due to her extreme hardship.

Despite Floriani's testimony to the contrary, the record indicates that the Board, either intentionally or by oversight, never considered petitioner's claim of hardship to his wife or that it mistook that claim for a claim of fatherhood exemption. If, in fact, the Board relied on an illegitimate ground to deny his request although it had legitimate grounds upon which to deny it, and the record is unclear as to which ground the Board relied upon, the classification cannot stand. *See* Sicurella v. United States, 348 U.S. 385, 391, 392, 75 S.Ct. 403, 406, 99 L.Ed. 436 (1955); *Messinger, supra,* 68 CR 333 at 39 n. 12. The court finds that the Board never considered the claim of his wife's dependency and, therefore, must conclude that the Board's action was arbitrary and capricious. *Weintraub, supra.* Since the Board never considered this claim, then *a fortiori,* it had no "basis in fact" for denying the requested classification.

What has already been said makes unnecessary a consideration of petitioner's other claim regarding the Board's subsequent refusal to reopen his classification, after the order to report for induction.

The petition for a writ of habeas corpus is granted with a stay of thirty (30) days to allow the Government to appeal.

This is an order.